Garry COBLE, Respondent,

v.

NCI BUILDING SYSTEMS, INC., Appellant.

No. WD 74845.

Missouri Court of Appeals, Western District.

Oct. 2, 2012.

---

Jonathan B. Milbourn and Paula L. Brown, Kansas City, MO, for appellant.

Judy R. Ullmann, Nevada, MO, for respondent.

Before: JOSEPH M. ELLIS, P.J., and ALOK AHUJA and MARK D. PFEIFFER, JJ.

ALOK AHUJA, Judge.

Gary Coble filed a Petition to recover unpaid commissions and other compensation from NCI Building Systems, Inc., following Coble's resignation from NCI in January 2011. NCI did not answer the Petition, and the trial court entered a default judgment against it. NCI then moved to set aside the default judgment. The trial court denied the motion to set aside, finding that NCI had failed to establish good cause for its default. NCI appeals. We affirm.

### Factual Background

NCI is a Texas corporation doing business in Missouri. Coble was a salesman for NCI and was paid a base salary plus commissions. Coble was also authorized to use a company credit card for both personal and business expenses, but was required to reimburse NCI for any personal charges. On January 3, 2011 Coble resigned from NCI. Coble received a final paycheck of $5,419.94, which purported to include payment for all outstanding commissions, as well as deductions for personal charges to the company credit card and associated late fees totaling $1,083.86.

After receiving his final paycheck Coble contacted NCI's Vice President of Sales, George Jeffries, to discuss what Coble contended were yet-unpaid commissions, the personal expenses withheld by NCI, and the return of training manuals that Coble claimed to have authored and lent to Jeffries. Between January and March of 2011, Coble contacted NCI twice in an attempt to resolve the matter. Dissatisfied with NCI's response, Coble retained counsel and filed suit.

On June 8, 2011, NCI's Missouri registered agent was served with process. The petition and summons were forwarded to NCI's Houston, Texas headquarters by Federal Express, and received in NCI's

headquarters' mailroom at 8:23 a.m. on June 10, 2011, as evidenced by a Federal Express receipt. The receipt indicates that the package was signed for by "A. Falls," an NCI employee.

NCI failed to answer Coble's Petition. Although NCI was in default, Coble mailed a Notice of Hearing to NCI's Missouri registered agent on July 8, 2011, notifying NCI of a default hearing scheduled for August 23, 2011. NCI's registered agent forwarded the Notice of Hearing to NCI's Houston headquarters by Federal Express, where the package was received on July 13, 2011 at 9:13 a.m. Once again, "A. Falls" signed for the package in NCI's mailroom. NCI did not appear at the default hearing.

Following the August 23 hearing, the trial court entered a default judgment in favor of Coble on August 31, 2011, in the amount of $30,592.69.

Sometime after September 19, 2011, NCI received notice of the default judgment.[1] On October 17, 2011, NCI filed a Motion to Set Aside Default Judgment. NCI attached two affidavits to its Motion: (1) an affidavit of Donna Walker, Cash Receipts and Invoicing Supervisor in the Corporate Accounting Department of NCI Group, Inc.,[2] which described the commissions paid and owing to Coble, and the basis for the credit card charges deducted from his final paycheck; and (2) an affidavit of Bradley W. Graham, Division Counsel for NCI Group, Inc., which sought to establish good cause for NCI's default.

Graham's affidavit states that all mail at NCI is sorted in its mailroom, which "received hundreds of pieces of U.S. mail daily, as well as dozens of parcels, express and courier mail." Graham's affidavit states that mail is delivered to the company's 250 employees two to three times daily, and that "[m]ail from registered agents for the company is to be addressed to NCI's general counsel." After generally describing NCI's mail-handling procedures, Graham's affidavit makes the following statements relevant to the documents served on NCI's registered agent in this case:

7. No one in the legal department ever received copies of the petition and summons or notice of hearing in this case. It is not known why this occurred.

8. I have conducted an investigation, and the petition, summons, and notice of hearing cannot be located anywhere in the company.

9. The only evidence that the aforementioned documents were received by NCI's mailroom is the records of National Registered Agents, Inc., NCI's registered agent in Missouri, and a Federal Express receipt, which was signed by an NCI mailroom employee.

10. NCI's first knowledge of the lawsuit was receipt of a copy of the default judgment.

On December 6, 2011 the trial court held a hearing on NCI's motion to set aside, at which arguments of counsel—but no additional evidence—were presented. On December 30, 2011, the court entered a judgment denying the Motion to Set Aside Default Judgment. The trial court's judgment "find[s] that [NCI] has not shown good cause why its default should be excused, and the entry of a Default Judgment set aside." Nevertheless, "having

---

1. The evidence submitted in support of NCI's Motion to Set Aside does not specify the date on which NCI in fact received the Judgment. The copy of the Judgment received by NCI contains an certification by a Deputy Circuit Clerk dated September 19, 2011.

2. NCI Group, Inc. is an affiliate of the defendant NCI Building Systems, Inc.

reviewed Defendant's allegations of a meritorious defense," the trial court *sua sponte* reduced the judgment from $30,592.69 to $20,592.01, plus interest and costs.[3] NCI appeals the trial court's refusal to set aside the default judgment.

## Standard of Review

We apply an abuse of discretion standard to the circuit court's setting aside of a default judgment under Rule 74.05(d). However, while the trial court's discretion to deny a motion to set aside a default judgment is "narrowed," its discretion to grant such a motion is "broad." Such deference has been afforded whether the evidence supporting the motion to set aside the default was presented through exhibits and affidavits or through live testimony. *Barsto Constr., Inc. v. Gladstone Senior Partners, L.P.*, 270 S.W.3d 440, 442 (Mo. App. W.D.2008) (citations and internal quotation marks omitted).

The "narrowed" discretion to deny a motion to set aside a default judgment stems from the public policy favoring the decision of cases on their merits. *Brungard v. Risky's Inc.*, 240 S.W.3d 685, 686–87 (Mo. banc 2007). Because of this "narrowed" discretion, "appellate courts are more likely to reverse a judgment which fails to set aside a default judgment than one which grants that relief." *Myers v. Pitney Bowes, Inc.*, 914 S.W.2d 835, 838 (Mo.App. S.D.1996). An abuse of discretion occurs when the trial court's "ruling is clearly against the logic of the circumstances then before the trial court and is so unreasonable and arbitrary that the ruling shocks the sense of justice and indicates a lack of careful deliberate consideration." *Peters v. Gen. Motors Corp.*, 200 S.W.3d 1, 23 (Mo.App. W.D.2006). "In close cases, deference must be given to the determination of the trial judge as to whether conduct in a particular case is excusable as not being reckless or intentional." *Bell v. Bell*, 849 S.W.2d 194, 198 (Mo.App. W.D.1993).

## Analysis

In its sole Point Relied On, NCI contends that the trial court abused its discretion in denying NCI's motion to set aside the default judgment, because Graham's affidavit established that it had good cause for its default.[4] We disagree.

Rule 74.05(d) provides that upon motion stating facts constituting meritorious defense and for good cause shown . . . a default judgment may be set aside. The movant in a motion to set aside a default judgment bears the evidentiary burden of proving entitlement to the relief requested. Failure to establish either the "meritorious defense" element or the "good cause" element of a motion pursuant to Rule 74.05(d) is fatal to the motion. *Saturn of Tiffany Springs v. McDaris*, 331 S.W.3d 704, 709 (Mo.App. W.D.2011) (citations and internal quotation marks omitted).

The Rule 74.05(d) standard for good cause "includes a mistake or conduct that is not intentionally or recklessly designed to impede the judicial process." The "good cause" standard is given a lib-

---

**3.** Neither party challenges the trial court's authority to amend the judgment to reduce the damages awarded to Coble.

**4.** By reducing the amount of the judgment based on its review of NCI's proffered defense, the trial court implicitly found that NCI had established a meritorious defense to Coble's claims, and Coble does not suggest that the lack of a meritorious defense could justify affirmance. We are therefore left to determine only whether NCI met the "good cause" prong of Rule 74.05(d).

eral interpretation, "not only to prevent a manifest injustice but to avoid a threatened one especially in cases tried without a jury where evidence on one side only is presented." *Young v. Safe–Ride Services,* 23 S.W.3d 730, 732 (Mo.App. W.D.2000)[5] (quoting *Brueggemann v. Elbert,* 948 S.W.2d 212, 214 (Mo.App. E.D.1997)).

 Negligent conduct can constitute "good cause," whereas reckless conduct does not. *Heintz Elec. Co. v. Tri Lakes Interiors, Inc.,* 185 S.W.3d 787, 793 (Mo.App. S.D.2006). When a reasonable doubt exists as to whether conduct is intentional or negligent, it "should be resolved in favor of good faith." *Barsto,* 270 S.W.3d at 442 (quoting *J.E. Scheidegger Co., Inc. v. Manon,* 149 S.W.3d 499, 504 (Mo.App. S.D.2004)). A person acts negligently "if his inadvertence, incompetence, unskillfulness or failure to take precautions precludes him from adequately coping with a possible or probable future emergency." *Mullins v. Mullins,* 91 S.W.3d 667, 670 (Mo.App. W.D.2002) (citations omitted). Recklessness, on the other hand, requires that the actor make a conscious decision to pursue a particular course of action "either with knowledge of the serious danger to others involved in it or with knowledge of the facts which would disclose the danger to a reasonable man." *Id.* Intentional indifference, meaning that an individual "does not care about the consequences of his or her actions," can constitute recklessness. *Barsto,* 270 S.W.3d at 443 (quoting *McElroy,* 156 S.W.3d at 403–04) (internal quotation

marks omitted). Recklessness generally involves "some element of deliberateness and of risk." *Heintz,* 185 S.W.3d at 793 (quoting *Brueggemann,* 948 S.W.2d at 214).

 NCI bore the burden of proving that "good cause" exists and that it is entitled to the requested relief. *Saturn,* 331 S.W.3d at 709. NCI sought to satisfy its burden of proving good cause through Graham's affidavit. The record also contains two Federal Express receipts signed by "A. Falls," apparently the NCI mailroom employee who actually signed for both the summons and Notice of Hearing.[6] Under our standard of review, we cannot conclude that the trial court abused its discretion in refusing to set the default judgment aside based on this evidence.

While Graham indicated that he had conducted an "investigation" into what happened to the two documents in question, his only conclusion was that the "summons and notice of hearing [could not] be located anywhere in the company." NCI offered no evidence indicating the extent of the "investigation" Graham conducted, including in particular whether he spoke to "A. Falls" or any other employee in the mailroom to find out what might have happened to the documents. Although NCI's appellate briefing characterizes this as a case of "a clerical error" and "failures in the internal procedure for delivering mail," no evidence supports the conclusion that NCI's default is actually due to clerical error or mishandling by

---

5. Overruled on other grounds, *McElroy v. Eagle Star Grp., Inc.,* 156 S.W.3d 392, 401 (Mo. App. W.D.2005).

6. The Federal Express receipts were submitted to the trial court by Coble. NCI offered no information to the trial court concerning "A. Falls," including his or her first name, length of employment with NCI, current employment status, level of training, or any traits

or attributes which may have caused "A. Falls" to mislay or misdirect the two packages at issue. Nor did NCI offer an affidavit from "A. Falls," either to describe his or her recollection of the handling of the specific packages at issue, or his or her general practices with respect to the handling of packages of this sort.

mailroom employees. Aside from its own speculation of mishandling, NCI offers no evidence as to what actually happened to prevent the summons and Notice of Hearing from reaching the legal department. The only evidence presented by NCI is that the documents disappeared. While the trial court may have been entitled to draw an inference from Graham's affidavit that the documents' loss was due to negligent mishandling by a mailroom employee, the trial court could also reasonably conclude that NCI had failed to satisfy its burden of proving good cause, given the complete—and completely unexplained—loss of two time-sensitive legal documents addressed to NCI's general counsel and sent by Federal Express, received more than a month apart, in a company as large and seemingly sophisticated as NCI.[7] The trial court was free to disbelieve that a company would lose two legally significant documents, without a trace, with no evidence as to what might have occurred, based on simple negligence.

 Moreover, in deciding whether good cause has been established, a trial court is free to "disbelieve statements made by a moving party in its affidavits." *Beckmann v. Miceli Homes, Inc.*, 45 S.W.3d 533, 542 (Mo.App. E.D.2001) (citation omitted).[8] There were specific reasons for the trial court to have been skeptical of NCI's showing of good cause. Graham's affidavit is vague, provides virtually no detail concerning the "investigation" he conducted, and offers no explanation as to what actually happened to the documents at issue. NCI failed to offer an affidavit from "A. Falls," or from any other employee within NCI's mailroom, to provide any specific—or even general—explanation for the loss of the documents. Nothing required the trial court to believe the factual assertions in Graham's affidavit, or required it to find that that affidavit established good cause.

NCI contends that this case is indistinguishable from a number of other cases where documents were negligently mishandled and good cause was found to exist. Thus, NCI cites *Pyle v. FirstLine Transportation Security, Inc.*, 230 S.W.3d 52 (Mo.App. W.D.2007), to argue that its conduct was nothing more than negligent document mishandling. In *Pyle,* the movant failed to file a timely answer because a new employee in the defendant's Human Resources Department misfiled the documents. *Id.* at 55. The evidence offered by the defendant indicated that, at the time the document were received in Human Resources, the new employee was the only employee present in the department. *Id.* This employee's training had been postponed due to Hurricane Katrina, and at the time the documents were received in early September 2005, the new employee had been assigned "the primary task of taking all hotline calls from [the 137 corporate] employees affected by the hurricane and assisting the employees and their families." *Id.* The new employee resigned on September 19, 2005, due to the overwhelming burden placed on her due to the hurricane. *Id.* The summons was found, misfiled, in a Human Resources Department file, supporting an inference that normal

---

**7.** The trial court was entitled to give weight to the fact that the loss of documents occurred not once, but twice. *Krugh v. Hannah,* 126 S.W.3d 391, 393 (Mo. banc 2004) ("in the three-year period before service in this case, four other default judgments had been taken against Millstone, or Blazier, personally"; this evidence "leads to the conclusion that she was well aware of the consequences of her inattention and makes her failure to file more egregious than excusable").

**8.** This holding of *Beckmann* was cited by the Missouri Supreme Court with approval in *Brungard,* 240 S.W.3d at 687.

company procedures relating to legal documents were followed up to the point that the new employee received them. *Id.* at 58. On that record, this Court found that the mistakes in *Pyle* constituted "good cause" under Rule 74.05(d). *Id.* at 60.

NCI cites a number of other cases involving document mishandling that rest on facts comparable to those in *Pyle*. *Barsto*, 270 S.W.3d at 443 (good cause found where management employee of defendant believed that filing of amended certificate of limited partnership with Texas Secretary of State, reflecting changed address, would update registered agent's records, and evidence indicated that registered agent had noted address change in its Texas office, but not in Missouri); *Young*, 23 S.W.3d at 731 (good cause found where corporate officer to whom registered agent forwarded suit papers was unaware of the specifics of a recent corporate reorganization, and accordingly sent suit papers to wrong affiliated entity in Colorado, rather than correct entity in Kansas); *Keltner v. Lawson*, 931 S.W.2d 477, 478–79 (Mo.App. S.D.1996) (good cause found where defendant promptly forwarded suit papers to insurer, but insurer failed to timely retain counsel or respond to lawsuit; litigation specialist initially assigned to claim by insurer resigned, and two other insurer employees responsible for reviewing a proposed settlement were absent from the office, one for a work-related injury, another for vacation); *Myers v. Pitney Bowes, Inc.*, 914 S.W.2d 835, 839 (Mo.App. S.D.1996) (good cause found after movant offered evidence that summons was lost due to the chaos of an office reorganization and only found after default judgment had already been entered); *Clark v. Brown*, 814 S.W.2d 634, 639 (Mo.App. S.D.1991) (good cause found where general manager's secretary, who was responsible for forwarding suit papers to organization's attorney, failed to do so, and was fired as a result); *Gibson by*

*Woodall v. Elley*, 778 S.W.2d 851, 854–55 (Mo.App. W.D.1989) (good cause found where petition documents were sent to the legal department at a time when all attorneys were attending a meeting out of town and the office was staffed by temporary secretaries who filed the documents incorrectly).

In all of the preceding cases, the party seeking relief from a default judgment offered some evidence of specific circumstances that explained the negligence of the defendant's agents or employees, and explained the actual disposition of the relevant documents. NCI, on the other hand, offers *no* evidence of circumstances that did, or may have, caused the disappearance of either the summons or the Notice of Hearing, and no evidence explaining how, or why (*e.g.*, due to workload, inadequate training, absence, or incompetence), the employees handling the documents might have been negligent. In fact, this case bears a strong resemblance to *Beckmann*, 45 S.W.3d at 542, in which the court questioned whether the conclusory statements offered in support of a defendant's motion to set aside default judgment were enough to satisfy the pleading requirements of Rule 74.05(d).

■ NCI also argues that its conduct is no more than poor business practice. It is true that unsound business practices are not necessarily reckless. *Gibson*, 778 S.W.2d at 854–55. However, we have little evidence of what NCI's business practices actually were. The only evidence NCI produced was Graham's affidavit, which recounts the volume of mail NCI receives and the frequency with which that mail is delivered to employees, and states that mail from registered agents is to be addressed to NCI's general counsel and forwarded to NCI's legal department. We have no evidence concerning the manner in

which NCI's mailroom performs mail sorting and delivery tasks, the training provided to employees on proper handling of packages, the measures taken to ensure that mail is timely and accurately delivered, or the frequency with which mail mishandling occurs. The trial court could conclude that two instances of document mishandling by the same employee, separated by more than a month, was more consistent with reckless indifference, rather than mere negligence. In the absence of specific evidence that the disappearance of the documents was due to merely negligent rather than reckless business practices, we cannot find that the trial court's decision to deny NCI's motion was "unreasonable and arbitrary." *Peters,* 200 S.W.3d at 23 (citation omitted).

We emphasize that, "[u]nder our standard of review, we do not determine whether we would have reached the same decision as the trial court." *Mocciola v. Mocciola,* 834 S.W.2d 872, 874 (Mo.App. E.D.1992). "If reasonable persons can differ as to the propriety of the trial court's action, then it cannot be said that the trial court abused its discretion." *Wilkerson v. Prelutsky,* 943 S.W.2d 643, 648 (Mo. banc 1997); *Evans v. FirstFleet, Inc.,* 345 S.W.3d 297, 302–03 (Mo.App. S.D.2011) (same). This opinion does not hold that, on this record, the trial court was prohibited from setting aside the default judgment; we hold only that the trial court's refusal to do so was not an abuse of discretion.

### Conclusion

For all of the foregoing reasons, the record before us does not "convincingly indicate" that the trial court abused its discretion by denying NCI's Motion to Set Aside Default Judgment. *Sears v. Dent Wizard Int'l Corp.,* 13 S.W.3d 661, 664 (Mo.App. E.D.2000). The judgment is affirmed.

All concur.